# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #063

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **9th day of December, 2014**, are as follows:

**PER CURIAM**:

2014-B -0647    IN RE: RANDY J. FUERST (Disciplinary Board)

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Randy J. Fuerst, Louisiana Bar Roll number 5767, be and he hereby is suspended from the practice of law for six months, with all but three months deferred, subject to the condition that any additional misconduct by respondent within six months from the finality of this judgment may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. It is further ordered that all investigative costs related to the MRW matter and one-eighth of the total litigation expenses are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days  from the date of finality of this court's judgment until paid.

JOHNSON, C.J., concurs.
KNOLL, J., concurs in result and assigns reasons.
WEIMER, J., concurs and assigns reasons.

SUPREME COURT OF LOUISIANA

NO. 14-B-0647

IN RE: RANDY J. FUERST

ATTORNEY DISCIPLINARY PROCEEDINGS

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Randy J. Fuerst, an attorney licensed to practice law in Louisiana.

**UNDERLYING FACTS**

At all times relevant to this proceeding, respondent has maintained a law office in Lake Charles, where his practice is almost exclusively confined to family law matters. Beginning in 1998, after he and his wife were divorced, and continuing through 2010, respondent was involved in consensual sexual relationships with six women who had at one time either retained his services or consulted with him regarding their divorce cases. With one exception, these sexual relationships did not occur while the attorney-client relationship was ongoing. We have briefly summarized these relationships below, referring to the women involved only by their initials to protect their privacy.

CCL consulted with respondent regarding her divorce in February 1998, but she did not retain him to represent her. Another lawyer filed a petition for divorce on behalf of CCL in March 1998. In April 1998, CCL and respondent began dating. Their relationship became sexually intimate, and continued until April 1999, when it ended amicably.

VADL retained respondent to represent her in her divorce. The parties were divorced in August 2001 and the case was concluded in January 2002 when the community property settlement was finalized. In the spring of 2002, VADL initiated a social relationship with respondent which became sexually intimate. In July 2002, the lawyer for VADL's ex-husband requested that respondent execute an act of correction to correct an error in the listing of a vehicle identification number that had been included in the community property settlement. Respondent signed the act of correction while his relationship with VADL was ongoing. Respondent's relationship with VADL ended amicably in February 2003.

MRW retained respondent to represent her in her divorce. In December 2001, respondent filed a petition for divorce on behalf of MRW pursuant to La. Civ. Code art. 102. During the six-month waiting period to file the rule to show cause why the divorce should not be granted, respondent and MRW engaged in a sexual relationship. Respondent has acknowledged that his conduct with MRW constituted a conflict of interest in violation of the Rules of Professional Conduct.

MLDG retained respondent to represent her in her divorce. Respondent filed a petition for divorce on behalf of MLDG in May 2004. Shortly thereafter, MLDG told respondent that she wanted to pursue a dating relationship, but respondent said he could not date a client. MLDG then terminated respondent's representation. In June 2004, respondent filed a motion to withdraw from MLDG's case, and a lawyer from the law firm with which respondent was then associated as "Of Counsel" enrolled on behalf of MLDG. Shortly thereafter, respondent and MLDG began a sexual relationship which lasted until 2007, when it ended amicably.

BDW retained respondent to represent her in her divorce. Respondent filed a petition for divorce on behalf of BDW in September 2006. In October 2006, BDW and her husband reconciled, and respondent withdrew from the

2

representation. In November 2007, BDW and her husband separated again. BDW consulted with respondent regarding her divorce at that time, but she did not retain him to represent her. In January 2008, respondent and BDW began a sexual relationship which lasted a couple of weeks but ended amicably thereafter.

BMP retained respondent to represent her in her divorce. Respondent filed a petition for divorce on behalf of BMP in May 2008. On June 10, 2008, BMP telephoned respondent to report that she thought she was being followed, and asked whether she could come to his home. Respondent agreed. Shortly after BMP arrived, BMP's husband was seen outside the house taking photographs. Respondent then escorted BMP to her car, and she left. The following day, June 11, 2008, respondent met with BMP and her parents and told them he was withdrawing from the representation. Respondent likewise informed the lawyer for BMP's husband that he would no longer be involved in the case. BMP retained new counsel to represent her, and a formal motion to substitute counsel was signed on June 16, 2008. On June 21, 2008, respondent and BMP commenced a sexual relationship during a trip to Houston together. The relationship between respondent and BMP lasted for approximately two and half years, until late 2010, when it ended amicably.

In addition to the relationships described above, the ODC presented the claims of two women who either retained respondent's services or consulted with him in their divorce cases but who were not involved in sexual relationships with him.

KGH retained respondent to represent her in her divorce. Respondent represented KGH between August 2001 and June 2002, during which time she claims that he asked her out to dinner and then hugged her goodbye and attempted to kiss her. Although respondent admitted that he hugged KGH goodbye upon their departure from a dinner meeting, he denied that he attempted to kiss her.

3

SKS consulted with respondent regarding her divorce in 2007, but she did not retain him to represent her. SKS claims that respondent made inappropriate comments to her during the initial consultation. Respondent denied doing so.

## DISCIPLINARY PROCEEDINGS

BMP's ex-husband filed a complaint against respondent with the ODC in October 2008. In June 2012, the ODC filed formal charges against respondent, alleging that his relationships violated the following provisions of the Rules of Professional Conduct: Rules 1.7(a)(2) (a lawyer shall not represent a client if the representation involves a concurrent conflict of interest wherein there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or third person, or by a personal interest of the lawyer), 1.8(b) (a lawyer shall not use information relating to the representation of a client to the disadvantage of the client unless the client gives informed consent), 1.10 (imputation of conflicts of interest), 2.1 (in representing a client, a lawyer shall exercise independent professional judgment and render candid advice), and 8.4(d) (conduct prejudicial to the administration of justice).

### *Formal Hearing*

After respondent answered the formal charges, the matter proceeded to a formal hearing on the merits. The hearing committee conducted the hearing over the course of four days in January 2013. Both respondent and the ODC introduced documentary evidence and called numerous witnesses to testify before the committee. Respondent also testified on his own behalf and on cross-examination by the ODC.

The ODC's witnesses included the following: BMP's ex-husband; attorney John Green, Jr. (attorney for BMP's ex-husband); Buddy Stockwell, the Executive Director of the Lawyers Assistance Program ("LAP"); BMP's mother; BMP; CCL; MRW; BDW's ex-husband; BDW; MLDG; VADL's ex-boyfriend; VADL; KGH; and SKS.

Respondent's witnesses consisted of the following: attorney Michael McHale (regarding the MRW matter); attorney Evelyn Oubre (regarding the BMP matter); attorney Lynsay Fontenot (regarding the SKS matter); Susan Arnold (respondent's former wife and character witness); Katina Soliz (respondent's office manager); Laurie Fontenot and Stephanie Young (respondent's paralegals); attorney Todd Melton (regarding the BDW matter); attorney Mindy Heidel (character witness); Dr. Patricia Post (respondent's previous psychologist); Mary Richardson (character witness); Dr. Warren Lowe (respondent's current psychologist); Rabbi Barry Weinstein (character witness); Judge Lilynn Cutrer (character witness); and attorney Jim Ortego (character witness).

The documentary evidence included respondent's sealed medical records and the sealed deposition testimony of medical professionals at Pine Grove Behavioral Health and Addiction Services who evaluated respondent in January 2012. The Pine Grove evaluation indicated that respondent is neither a sex addict nor a sexual predator but does have professional boundary issues. Sealed records from respondent's psychologist, Dr. Warren Lowe, indicate that respondent attended a professional boundaries course in November 2011 and continues to participate in an ongoing, weekly advanced ethics course on professional boundaries. Respondent has also attended individual counseling sessions with Dr. Lowe since July 2011.

*Hearing Committee Report*

After considering the evidence and testimony presented at the hearing, the hearing committee made the following factual findings:

The CCL matter – The committee found CCL's testimony very credible. She consulted with respondent about a divorce but did not hire him, instead choosing to hire another attorney. About a month after the consultation, she began dating respondent. This relationship lasted approximately one year, and the breakup was friendly and positive. In light of these facts, the committee found no clear and convincing evidence of any violations of the Rules of Professional Conduct in this matter.

The VADL matter – The committee found that respondent represented VADL in divorce proceedings. Six months after the divorce was granted, respondent and VADL began a sexual relationship. The evidence revealed that respondent signed off on an act of correction during the time he and VADL were involved sexually. This document corrected an error in the listing of the vehicle identification number on an automobile that had been part of a property settlement signed earlier by the parties. VADL believed respondent was no longer her attorney once the divorce was final. The committee found that VADL did not consider respondent to be her attorney at the time they were involved in a sexual relationship. The committee determined respondent's signing of the act of correction was not an act in furtherance of the divorce but simply a ministerial act requested by opposing counsel to correct a document that had already been executed prior to any sexual relationship developing between VADL and respondent. In light of these facts, the committee found no clear and convincing evidence of any violations of the Rules of Professional Conduct in this matter.

The MRW matter – The committee found that respondent represented MRW in divorce proceedings. The only matter left to complete was to toll the six-month

waiting period to confirm the divorce. During this waiting period, MRW invited respondent to have a drink at her house. Respondent went to her house, and they had a sexual encounter. Based on these facts, the committee found that respondent violated Rules 1.7(a)(2) and 8.4(d) of the Rules of Professional Conduct in this matter.

The KGH matter – KGH testified that respondent hugged her and attempted to kiss her after they departed from a dinner meeting. Thereafter, KGH continued with respondent as her attorney for approximately two years, and the committee accepted respondent's explanation that he did hug her, as he does with most people, but that he did not attempt to kiss her. Based on these findings, the committee found no evidence of any violations of the Rules of Professional Conduct in this matter.

The MLDG matter – The committee found that respondent filed a divorce petition for MLDG on May 19, 2004, the same day she initially consulted with him. Later, MLDG expressed an interest in dating respondent, but he told her he could not date a client. Her response was that she would get another attorney. Respondent referred her to another attorney in the law firm with which he was "Of Counsel" and filed a motion to withdraw. MLDG's testimony was very credible and powerful. She did not enter into a social or sexual relationship with respondent until after he withdrew as her attorney. She also stated that their relationship was positive and beneficial to her. The committee found that, although respondent was "Of Counsel" to the same law firm in which MLDG's new attorney worked, any personal interest of respondent did not present a significant risk of materially limiting her new attorney's representation. MLDG's testimony also clearly indicated that her husband's behavior was not different after she began dating respondent than it was before. Given these facts, the committee

7

found no clear and convincing evidence of any violations of the Rules of Professional Conduct in this matter.

The BDW matter – The committee found that, in August 2006, BDW hired respondent to file a petition for divorce, which he did. Shortly thereafter, she called respondent and requested that the petition be dismissed. Respondent complied with BDW's wishes before the petition was served on her husband, and respondent filed a motion to withdraw as BDW's counsel in October 2006. In November 2007, BDW met with respondent to review divorce documents another attorney was going to file on behalf of her and her husband. Since she and her husband had agreed to most issues, BDW told respondent she did not need an attorney and left his office without hiring him. She felt that any professional relationship with respondent was over once he finished reviewing her divorce documents. BDW's husband filed for divorce in December 2007. After the petition for divorce was filed, BDW and respondent went to a social event and, two weeks later, began a sexual relationship that lasted approximately one month. BDW did not feel respondent had taken advantage of her, and she and her husband got along well after the divorce. Based on these facts, the committee found no clear and convincing evidence of any violations of the Rules of Professional Conduct in this matter.

The SKS matter – SKS testified that respondent made inappropriate comments to her during their initial consultation. The committee determined respondent's testimony that he did not make any inappropriate remarks was more credible than SKS's testimony. Based on these findings, the committee found no evidence of any violations of the Rules of Professional Conduct in this matter.

The BMP matter – The committee found that BMP hired respondent on April 28, 2008 to file a petition for divorce. The petition for divorce was filed on May 6, 2008. On June 10, 2008, BMP came to respondent's home uninvited to

complain that someone was following her. Respondent invited her into his house for a minute. During the course of the conversation, BMP began talking in an affectionate way, and respondent told her that he needed to be her attorney. During the conversation, respondent and BMP saw flashes through the stained glass windows of respondent's home, which flashes were caused by BMP's husband taking pictures of her car in the front of respondent's house. Instead of calling the police, respondent told BMP that he would deal with the matter the next day with her husband's attorney.

The next day, respondent and an associate met with BMP and her parents. The entire domestic relationship between BMP and her husband had been extremely acrimonious, and one of the things that caused extreme problems with the divorce was the fact that BMP's husband did not want her to use respondent as her attorney. BMP's husband had actually provided a list of attorneys she could use. The representation was made even more problematic by BMP being at respondent's house the night before and respondent witnessing her husband's violation of the restraining order in the case. Ultimately, everyone agreed that respondent would withdraw as BMP's attorney, and BMP chose attorney Evelyn Oubre to represent her.

Respondent filed a motion to withdraw, and Ms. Oubre enrolled as BMP's counsel on June 16, 2008. On June 21, 2008, respondent and BMP went on a trip to Houston where they began a sexual relationship that lasted two and a half years. BMP's testimony was very credible. She did not appear to have been vulnerable or taken advantage of by respondent. She considered their relationship to be a good one. Based on these facts, the committee found no clear and convincing evidence of any violations of the Rules of Professional Conduct in this matter.

Based on the above findings in these several matters, the committee determined that, with the exception of MRW, the women with whom respondent

had sexual relationships were no longer clients at the time the sexual contact occurred based upon their belief and understanding that respondent was no longer their attorney or that respondent had manifested to them that he had withdrawn as their attorney.[1] As such, the only violation of the Rules of Professional Conduct was in connection with respondent's relationship with MRW.

The committee determined that respondent negligently violated duties owed to his client and the legal profession. There was no apparent harm, but the potential for harm existed. Citing the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is suspension.

In aggravation, the committee found substantial experience in the practice of law (admitted 1981). The committee also found the following mitigating factors: absence of a prior disciplinary record, absence of a dishonest or selfish motive, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, character or reputation, delay in the disciplinary proceedings, and remorse.

Turning to the issue of an appropriate sanction, the committee recommended respondent be suspended from the practice of law for thirty days, fully deferred, subject to one year of unsupervised probation. The committee also recommended respondent be assessed with the costs of these proceedings.[2]

The ODC filed an objection to the hearing committee's report and recommendation, arguing that the committee failed to find violations of the Rules

---

[1] In support of this finding, the committee cited *Louisiana State Bar Ass'n v. Bosworth*, 481 So. 2d 567 (La. 1986), wherein the court stated that "[t]he existence of an attorney-client relationship turns largely on the client's subjective belief that it exists."

[2] Respondent objected to the portion of the committee's ruling assessing him with costs, which totaled $17,900.59 at the time the committee issued its report. He argued that the costs and expenses unrelated to the charge involving MRW, the only charge found by the committee to have been proven, should not be assessed against him. The committee agreed with respondent's position but did not believe it had the authority to recommend an adjustment of the costs.

of Professional Conduct where they existed and recommended a sanction that is inadequate to address the extent of the misconduct in which respondent engaged.

*Disciplinary Board Recommendation*

After review, the disciplinary board determined the hearing committee's factual findings are supported by the record and are not manifestly erroneous. The board further determined the record supports the committee's conclusion that respondent did not violate the Rules of Professional Conduct except with regard to the MRW matter. The board adopted the committee's finding that respondent violated Rules 1.7(a)(2) and 8.4(d) with respect to MRW and additionally found that respondent violated Rule 2.1 in the MRW matter.

Based on these findings, the board determined respondent negligently violated duties owed to his client. While the misconduct did not cause actual harm, the risk for harm was great. Considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined the baseline sanction is suspension.

In aggravation, the board found substantial experience in the practice of law and the potential for harm. The board also found the following mitigating factors: absence of a prior disciplinary record, absence of a dishonest or selfish motive, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, character or reputation, remorse, and no apparent harm to any clients.

As a sanction, the board recommended respondent be suspended from the practice of law for thirty days, fully deferred, subject to one year of unsupervised probation. Regarding the costs and expenses, a majority of the board recommended respondent be assessed with only the investigative costs related to the MRW matter and only one-eighth of the total litigation expenses.

The ODC filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

**DISCUSSION**

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

In this matter, the hearing committee and the disciplinary board determined that respondent committed attorney misconduct by engaging in a sexual relationship with a current client, MRW. The record supports this finding. However, the ODC also argues that the ethical prohibitions against attorney-client sexual relationships should be extended to former clients, and should likewise apply in instances in which the lawyer has been consulted by a prospective client but no attorney-client relationship is ultimately formed. We find no support for this position in the Rules of Professional Conduct. Therefore, we find no misconduct in respondent's relationships with BMP, MLDG, VADL, CCL, or BDW. Finally, the ODC alleged respondent acted inappropriately toward two women, KGH and SKS, but did not engage in sexual relationships with them. The hearing committee made factual findings that respondent did not engage in any

12

inappropriate conduct toward these women. We find no manifest error in the committee's factual findings in this regard.

Although respondent's sexual relationship with MLDG does not constitute misconduct, we do find that he violated Rule 1.10 by referring her legal matter to another lawyer in the law firm with which he was associated as "Of Counsel." A lawyer who is "Of Counsel" to a law firm is considered to be a member of the firm for purposes of analyzing imputed disqualification questions. ABA/BNA Lawyers' Manual on Professional Conduct, 91:511-512 (2012). After respondent was discharged by MLDG, he was required to refer her divorce case to a lawyer outside his law firm prior to the time that he became involved in a personal relationship with her.

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

We find respondent negligently violated duties owed to his clients. While respondent's misconduct did not cause actual harm, the potential for harm was great. Considering the ABA's *Standards for Imposing Lawyer Sanctions*, the applicable baseline sanction is suspension.

In aggravation, we find that respondent has substantial experience in the practice of law. In mitigation, we find the following factors: absence of a prior disciplinary record, absence of a dishonest or selfish motive, full and free

13

disclosure to the disciplinary board and a cooperative attitude toward the proceedings, character or reputation, and remorse.

Considering all the facts of this case, we conclude the appropriate sanction for respondent's misconduct is a six-month suspension from the practice of law. However, in light of the significant mitigating factors present, we will defer all but three months of that sanction, subject to the condition that any additional misconduct by respondent within six months from the finality of this judgment may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate.

With regard to costs, we believe the board's division of costs is equitable considering the novel nature of these proceedings. Accordingly, we will not disturb the award of costs.

**DECREE**

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Randy J. Fuerst, Louisiana Bar Roll number 5767, be and he hereby is suspended from the practice of law for six months, with all but three months deferred, subject to the condition that any additional misconduct by respondent within six months from the finality of this judgment may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. It is further ordered that all investigative costs related to the MRW matter and one-eighth of the total litigation expenses are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

12/09/14

SUPREME COURT OF LOUISIANA

NO. 14-B-0647

IN RE: RANDY J. FUERST

ATTORNEY DISCIPLINARY PROCEEDINGS

**KNOLL, J., concurs and assigns reasons.**

While I fully concur with the majority's decision to suspend respondent from the practice of law, I write separately because my reasoning differs from that of the majority.

At the outset, I agree with the majority's conclusion that respondent committed misconduct by engaging in a sexual relationship with a current client, but I strongly disagree with the majority's finding respondent committed no misconduct with regard to his relationships with his former clients.

I acknowledge the question of whether a sexual relationship with a former client constitutes an ethical violation is *res nova* in our jurisprudence. However, pervading our case law concerning the lawyer's relationship with current clients is the overarching notion that a lawyer is forbidden from advancing his personal interests at the expense of his client's interests. This duty may persist even after the termination of the attorney-client relationship in cases where the lawyer's actions may have the potential to harm the former client's interests.

When a sexual relationship arises during the course of the representation, immediate termination of the attorney-client relationship is a mandatory step in ameliorating the harm to the client's legal interests. However, termination does not entirely eliminate the lawyer's ethical obligations to his now former client. Rather, as shown by Rule 1.9, an attorney has continuing duties toward former clients which do not cease merely because the professional relationship has ended.

Respondent's conduct may not directly impact any of the specific duties toward former clients set forth in Rule 1.9. Nonetheless, courts have recognized that the specific duties in Rule 1.9 derive from a general duty of loyalty to the former client. *See Brent v. Smathers*, 529 So. 2d 1267, 1269 (Fla. App. 3d Dist. 1988) (explaining the Florida version of Rule 1.9 "also imposes upon the lawyer a duty of loyalty"); *see also United States v. Culp*, 934 F. Supp. 394 (M.D. Fla. 1996) (holding that "under the ethical canons a duty of loyalty exists apart and distinct from the duty to maintain client confidences").

Inherent in the duty of loyalty is the corresponding duty to protect the client's best interests. While this duty primarily impacts ongoing representation, the attorney must continue to act in a way so as not to actively harm the former client's best interests even after the professional relationship ceases.

The facts of this case illustrate the potential danger a sexual relationship between the lawyer and a former client may pose to the client's interests even after the relationship is terminated. For example, concerning the clients identified as BMP and MLDG, respondent commenced a sexual relationship with each of these women after his representation was terminated but before the underlying domestic proceedings were concluded. A lawyer's decision to begin a relationship while domestic proceedings are ongoing can present a range of foreseeable problems which have a clear potential to harm the former client's best interests. Depending upon the stage of the underlying proceeding, the sexual relationship could raise fault issues and impair the former spouse's ability to seek support. By interjecting himself into the former client's personal life, the lawyer might be transformed into a witness in the proceeding. At the very least, the relationship might increase acrimony between the spouses and impact issues such as child support and property settlements.

2

Considering these factors, I would find respondent had a duty to refrain from entering into a sexual relationship with his former clients until the underlying proceedings are concluded. By failing to do so, respondent has placed his personal interests ahead of his professional obligations. He has potentially jeopardized his clients' legal matters and burdened them by forcing them to find new legal representation.[1] Respondent's actions convincingly demonstrate he falls far short of the high expectations we place on all members of the bar. The frequency of respondent's sexual involvement with numerous female clients evidences a *pattern of conduct* by means of his practice which degrades his obligations to the client and demeans our time-honored profession. His actions have not only adversely affected the interests of his clients, but negatively impact the public's confidence in the legal profession. In my opinion, this conduct warrants sanctions.

Accordingly, I respectfully concur in the result reached by the majority's opinion.

---

[1] The majority finds respondent should be disciplined based on his decision to refer a former client to another lawyer in the law firm with which he was associated. However, I would pretermit a discussion of his issue, as I find respondent never should have created a situation in which his personal interests would preclude him from representing his client.

**12/09/14**

# SUPREME COURT OF LOUISIANA

## NO. 14-B-0647

## IN RE: RANDY J. FUERST

*ATTORNEY DISCIPLINARY PROCEEDING*

**WEIMER, J.**, concurs.

I agree with the concurrence of Justice Knoll, but would add that an attorney's duty to refrain from entering into a sexual relationship with a former client stems from the prohibition against conduct prejudicial to the administration of justice, as described in Rule 8.4(d). This duty would terminate when the underlying proceedings are concluded or when the sexual relationship would pose no adverse legal consequences to the client. As this court has previously explained, "[t]he proscription against conduct that is prejudicial to the administration of justice most often applies to litigation-related misconduct. **Louisiana State Bar Ass'n v. Harrington**, 585 So.2d 514, 520 n.4 (La.1990) (citing examples). However, Rule 8.4(d) also reaches conduct that is uncivil, undignified, or unprofessional, regardless of whether it is directly connected to a legal proceeding." **In re Downing**, 05-1553, p. 12 n.5 (La. 5/17/06), 930 So.2d 897, 904. In this matter, the respondent was required to refrain from post-representation sexual conduct with the client that could foreseeably and negatively impact the legal proceeding for which the client had retained the respondent's representation.